[Crim. No. 940. Second Appellate District, Division One.—March 5, 1923.]

## THE PEOPLE, Respondent, v. FAY ALMA SMITH, Appellant.

[1] CRIMINAL LAW—MURDER—EVIDENCE—VERDICT.—In this prosecution for the crime of murder, the evidence disclosed a situation where a jealous woman became infuriated at what she believed to be the unfaithfulness of her companion and, with malice and intent to do the very thing she accomplished, made an attack and shot to death the man whom she believed had come to prefer another woman to her, and this without believing in the smallest degree that it was necessary to resort to such extreme means to defend herself against a threatened attack; and such evidence was sufficient to justify the verdict of conviction of murder in the second degree.

[2] ID.—INTEREST OF WITNESS—IMPROPER CROSS-EXAMINATION.—On cross-examination of the woman whom defendant believed the deceased had come to prefer, the trial court properly sustained the prosecution's objection to a question asked by defendant's counsel the purpose of which was to ascertain if the witness was living with the deceased at the time of the shooting, thereby showing interest.

[3] ID.—BULLET-HOLE IN FLOOR—EVIDENCE.—In this prosecution for murder, the evidence having shown that five shots were fired, but only four bullets having been originally accounted for, a piece of flooring containing a bullet-hole and the bullet which was found beneath it lying on the plaster and which corresponded in size and character to the other bullets found in and about the body of the deceased, were properly admitted in evidence in rebuttal and as the basis for the argument that at least one shot was fired after the victim had fallen prone upon the floor, notwithstanding they were not discovered until more than seven months after the shooting, the failure to notice them immediately following the shooting having been accounted for by the fact that there was a carpet on the floor at the time, and it having been shown that no other shooting had taken place in the room in question.

[4] ID.—SELF-DEFENSE—ACT OF REASONABLE PERSON—INSTRUCTIONS.—In a prosecution for murder, an instruction to the effect that the deceased had the right to defend herself from an attack which threatened her life, or threatened great bodily injury to her, and to use the judgment "of a reasonable person situated in like circumstances," and that, when so acting, if she believed herself to be in grave danger, as defined in the instructions, then she might there stand and kill her assailant and be justified, even

though it afterward appeared that, as a matter of fact, the danger which for the moment was apprehended by her was not real, is not open to the objection that it required the defendaut to act as a reasonable person would have acted, without the qualification that the jury should consider the situation from the standpoint of the defendant situated as she was shown to have been at the time.

[5] ID.—INSTRUCTIONS—KILLING AFTER NECESSITY CEASED.—In such prosecution, an instruction that if the defendant fired a shot into the body of the deceased after all necessity for the use of a weapon in self-defense had ceased, she would not be justified, correctly expressed the law when considered with the other qualifying terms contained in the body of the same instruction.

[6] ID.—ARGUMENT—PRESENTING FACTS OF OTHER CASES—INSTRUCTIONS—APPEAL.—While it is better practice for counsel to refrain from presenting alleged facts of other cases for the purpose of convincing the jury of the logic of the argument, the appellate court will assume that the jury followed the court's instructions and that no prejudicial error arose from the act of the district attorney in including in his argument a statement of alleged facts claimed to have been shown in another case in the same court, the district attorney stating, however, that he was making the statement for the purpose of illustration, where the jury was instructed that, in making up their minds as to the guilt or innocence of the defendant, they should be guided solely by the evidence introduced at the trial and by the instructions as to the law as given by the court.

APPEAL from a judgment of the Superior Court of Los Angeles County. Russ Avery, Judge. Affirmed.

The facts are stated in the opinion of the court.

E. Burton Ceruti for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

JAMES, J.—Defendant was convicted of the crime of murder in the second degree, and has appealed from the judgment of imprisonment and from an order denying a motion for a new trial.

On the 14th of February, 1922, defendant shot and killed Arthur Bell, using a 38-caliber revolver, from which she fired five shots at close range, all of which entered the body of the deceased. Both defendant and the deceased were of

the negro race, defendant being at the time of the shooting twenty-seven years of age and the deceased thirty-one. Defendant had formerly been married to a man named Smith, from whom she claimed to have been divorced. For a large portion of the six years immediately preceding the tragedy she had lived with the deceased, although not married to him. During the time that she sustained the relation indicated toward Bell there had been many quarrels between the two, due (according to defendant's assertion) to attentions which Bell bestowed upon other women. It was because of this alleged propensity of Bell that the quarrel was precipitated, which resulted in Bell's death on the date charged in the information.

On the night in question an inmate of the small rooming-house which was being conducted by defendant and Bell in the city of Los Angeles heard the couple, as he said, "fussing"; he heard defendant scream and immediately thereafter heard shots fired. On going to the room occupied by the two, he called out, asking what the trouble was, and defendant replied, "We were fighting in here." The witness entered the room and saw Bell lying on the floor, with the defendant standing near by and close to a dresser upon which a revolver lay. The witness departed in search of a physician. Another witness, who came to the room immediately after the person last mentioned had departed, found the door closed. At his call the door was unlatched by the defendant, who appeared with a revolver in her hand. Bell was lying on the floor, the witness stated, and called for water. The witness testified that the defendant remarked: "He is dressing to go to see that bitch. Let him go now!" Officers and attendants with an ambulance from the city hospital soon arrived. To an inquiry made in the room as to who had done the shooting, defendant replied, "I did." Before the arrival of ambulance and officers, defendant had replaced the five empty shells in the revolver with loaded cartridges. The injured man was conveyed to the hospital, where he died the same night from the effects of his wounds.

A witness, who was at a bootblack-stand on the street opposite the building in which the defendant and deceased were, heard the shots; he testified that the first three shots came in quick succession; that an interval of time then en-

sued, which the witness stated was of about a minute's duration, and then the last two shots were heard. The time elapsing, according to the witness, between the third and the fourth shots, was sufficient to allow him to walk from the bootblack-stand two doors south. Another witness, who was also at the bootblack-stand and heard the shots, testified that the first three shots were fired within a space of five seconds; that there was an interval of twelve or fifteen seconds between the third and fourth and of twenty-five or thirty seconds between the fourth and fifth.

Of the five bullets which caused wounds in the deceased's body, but four were found, assuming that the bullet which was discovered in the floor in the September following was one of these. The hospital attendants found two of the leaden pellets in the clothing of the deceased when they removed them, and the physician who performed the autopsy found one bullet imbedded under the skin. The wounds showed that all of the bullets had passed completely through the body of the deceased except the one last mentioned. Three of the bullets had entered the front of the body; two at the left side or hip. One of the bullets, which did great damage, entered the abdomen, slightly at the right of the navel, took a downward course of about forty-five degrees and emerged at the back. One of those entering at the left hip took an upward course of an equal number of degrees, also perforating the abdominal section. This one emerged and was taken from the skin close to the left breast. It would appear from the testimony of the autopsy physician that either of the two wounds which have been referred to as taking a downward and an upward course of forty-five degrees necessarily would have resulted fatally, while the others might not have had such a result.

On the next day defendant was interviewed at the police station, where she made a statement covering details of the occurrence which immediately preceded the shooting. She told also of her relations with the deceased and of the quarrels that occurred between them. She stated that on the night of the shooting, after she returned, as will later appear, at about 9:30 or 10 o'clock, Bell was there and remained about the place until after 12 o'clock, when he started to dress himself. She stated that she asked him where he was going at that time of night and he told her

it was none of her business, and that she was "getting too —— —— sly, anyway." She then proceeded with the following narrative: "I said, 'Because a woman doesn't let a man make a —— —— fool out of you she has to be sly.' To show me that I was too sly he made a pass at me and I ducked it, and he hit at me and I dodged again and rushed to the dresser and grabbed the gun and started shooting. We had been quarreling all along in the week before. He had beaten me because I had gotten after him about this girl. So I said I was not going to let him beat me up any more about some one just because I asked him about her. . . . He had on his pants, a little sweater coat; and when we first started to quarreling he had just got through combing his hair, and I think he still had on his house slippers. He had got through combing his hair and we were quarreling during that time, and then the argument began to get hotter and hotter, and then he struck me while I was standing near the corner of the foot of the bed; so I dodged this blow and he made another pass and hit me a glancing blow while I was going towards the dresser; and then I was near enough to pull the drawer open and get the gun out. Then I started to shooting, and just kept shooting, and did not know if I hit him or not. . . . I don't think he fell until after I went out of the room. I ran out into the hall. The drawer was still open where I got the gun out, so I grabbed some more bullets and ran out into the hall, as I didn't know if he was going to run after me or not, and I was going to keep shooting him because I was afraid of him as he had fought me time and again." By an officer: "Q. How long have you been living with him? A. Six years. Q. About how many quarrels have you had during that time? A. Really, I do not know just how many. Once in Oxnard we had a big quarrel when he brought this girl, Baby, down . . . , and I caught them together and gave her a good beating. We have quarreled about different women at different times, but specified times I do not remember. . . . Q. Then he really only struck you once, did he not, last night? A. That was the only chance he got to hit me. He hit at me once and I dodged one blow, and then grabbed the gun out of the dresser. . . . Q. Well, now, this quarrel you were having was of the same nature as other quarrels you have had previously, was it not? A.

Yes, sir. Q. Has he ever cut you or shot at you or anything? A. No; he has hit me with his hands and chairs and things like that.''

In this statement made by defendant on the day following the shooting she did not claim that she had been struck, injured, or bruised in any manner by her last encounter with the deceased, and there was no evidence to show any bruises appearing upon her body. At the trial, however, she made a statement that Bell had thrown a bottle at her which struck her on the head; that he grabbed her by the throat and shook her, and started to pick up a chair to strike her, when she got away, secured the revolver and began to shoot. As referring to Bell's position when the different shots were fired, she did not, even at the trial, claim that he remained confronting and threatening her until the shooting ceased. Her testimony given on that point was in part as follows: ''Q. Is it not a fact that when those shots were fired that Bell was either in the act of falling over, or was already on the floor?'' to which she replied, ''I don't remember; . . . I don't remember how I fired. I just pulled the gun, kept shooting.'' She was asked also the direct question as to whether she did not fire a shot while Bell was lying on the floor, to which she replied that she did not, adding, ''Not as I remember.'' Again the question was asked of her: ''Will you say you didn't fire a shot while he was almost on the floor, falling over?'' to which she replied, ''As far as I remember, I don't remember that I did. I just grabbed it and shot, was all.

The woman whose alleged friendship with Bell was the cause of the fatal quarrel was named Jimmie Seigler. She was produced at the trial and told of a visit made to her on February 5th—twelve days before the shooting—by the defendant. She testified that defendant entered her house and said that Arthur Bell had sent her to tell the witness ''not to be sending him any more messages''; that the witness had responded, ''I haven't sent any messages,'' and that the defendant said, ''Well, I just want to let you know, if you have you better stop, because I am Arthur's lawful married wife. If I ever catch you and Arthur together I am going to kill both of you; I am going to put an end to you''; that defendant then ''went on and told about differ-

ent girls she had beat up about him—two or three other girls she beat up about Arthur''; that when defendant was ready to go she repeated, "I mean that. If I catch you together that is going to be the end of you, I am going to kill both of you."

Early in the evening on the night of the tragedy defendant requested a male acquaintance to drive her to a railway depot, where she made inquiry as to the time trains would depart for Arizona points. (It afterward appeared that she had understood that Jimmie Seigler had requested Bell to meet her [Seigler] at the depot before the departure of a train.) When the party returned to a point near the place where defendant and Bell lived, defendant, for the purpose of ascertaining whether Bell was at home, dispatched one of the party with instruction to make inquiry of Bell as to the whereabouts of a woman, which woman in fact was at the time with defendant in the automobile. The defendant then went to a point near the place of residence of Jimmie Seigler, and, placing herself by or behind some billboards, dispatched a young man, whose services she had impressed for the purpose, to the house with instruction to tell Jimmie Seigler that Arthur Bell was waiting around the corner to see her. The message was delivered, but had no effect in the direction of inducing the Seigler woman to leave her home and, after waiting for a little time by the billboard, defendant departed. She finally returned to the lodging-house, where she changed her clothes.

Wagner, the young man who had delivered the message to the Seigler home, stated that after defendant returned to the automobile and the machine had started, she said to him, "I am going home. I don't want to kill him. I am going home and give him a good beating, because I don't want him making no damn fool out of me. I know he is scared of me. That is the reason I am not going to do anything but give him a good beating." Several friends were at the house when defendant returned, and they left at about 12 o'clock.

[1] The point is first urged that the evidence is not sufficient to justify the verdict. From the summary which has been made of the most important of the evidence, introduced mainly on behalf of the prosecution, it must be apparent that a case was presented which warranted the

jury in returning the verdict that it did. Defendant admitted freely that she had frequently quarreled with deceased, which quarrels were prompted by her objection to the attentions which he paid to other women; those quarrels all had similar accompaniments, she upbraiding Bell and he (as she testified) striking her or throwing things at her. As illustrating the *animus* which was aroused in her by reason of Bell's attentions to other women was her own statement of how she had "beaten up" a girl at Oxnard. The testimony of Jimmie Seigler that defendant threatened to kill both her and Bell if she ever found them together showed that the idea of doing violence toward both of those parties was present in defendant's mind before the tragedy. While the revolver with which the shooting was done was the property of Bell, it was usually kept in the top drawer of the dresser in the room where the shooting occurred, and defendant was well acquainted with that fact. It appears by her own statements that defendant had full reason to know that a return to the ever-bitter subject would precipitate a quarrel, as a result of which one or both of the participants might suffer bodily injuries. Knowing all this, and acting outside of the protection of any right growing from a marriage relation, she renewed the dangerous discussion—in effect, deliberately precipitated the quarrel. In making this statement we are allowing the defendant credit for veracity in her assertion that she had been on prior occasions struck and bruised by Bell. Her failure to claim or exhibit any physical injuries at the time of the shooting or on the day following, when she made her statement to the police officers, is significant as evidence indicating that on the night of February 14th she was not violently attacked by Bell. The testimony given by the witnesses who heard the shooting showed that the shots were not fired in a volley, as under the convulsive hand of a hysterical person, wrought up to a pitch of unreasoning excitement or fright, but in a manner indicating some deliberation.

[2] On the cross-examination of the witness Jimmie Seigler, defendant's counsel, referring to a time before the day of the shooting, asked the witness this question: "Were you living with Arthur Bell at that time?" to which question the district attorney objected on the ground that it was not proper cross-examination and was an attempt to de-

grade the witness. Counsel for appellant insisted that it went to the interest of the witness. The court sustained the objection. We think that the objection was properly sustained. It did not fall within the strict limits of proper cross-examination, and, moreover, if admissible as showing interest, it could not well have illustrated any different interest than that which the jury might infer from the relations shown to exist between the two women and Bell from other evidence.

[3] On September 18, 1922, more than seven months after the shooting of Bell occurred, a deputy district attorney and certain police officers visited the room which had been occupied by defendant and deceased, and from which deceased was taken. They made further examination of the premises to discover marks of bullets. On this visit the deputy district attorney and officers found, at the place where the body of Bell was proved to have lain, a bullet-hole in the floor, which extended entirely through the boarding which was about an inch in thickness. A piece of the flooring containing the hole was sawed out and a detached bullet was found lying on the plastering beneath. This bullet and piece of flooring were introduced in evidence and the prosecution used the evidence as a basis for the argument that at least one shot was fired by the defendant after Bell had fallen prone upon the floor. Defendant's counsel strenuously objected to the introduction of the evidence on the ground that the time of the discovery of the hole and bullet was too remote from the date of the shooting, and that it was not sufficiently established that, by some other instrumentality and persons unconnected with the defendant, the hole had been made and the bullet lodged where it was found. In order to establish a foundation for the introduction of this evidence the district attorney proved by a police officer that whenever shooting of any kind was reported to have occurred in the city, a record was made of the occurrence by the police department and that search had been made through that record covering dates at least a year prior to February 14th and from that on down to the date when the bullet-hole and bullet were discovered in September, and that there was no record of any shooting having occurred at that place during that time. There was testimony also of the lessee of the building, who had kept and

rented the rooms for a considerable portion of the time subsequent to the date of the shooting. This testimony showed that, so far as that witness knew, there had been no discharge of firearms in or about the premises, although she admitted that a particular room had been occupied by one or two tenants who had the exclusive possession of the apartment. The date of the discovery of this bullet-hole and bullet was indeed remote from the time of the shooting of Bell, and it is a matter justifying the comment that it is rather remarkable that the officers engaged in that investigation should not have discovered the important evidence at the time that the original investigation was made of the circumstances of the shooting. However, it did appear that at the time the shooting occurred the floor was covered with a carpet and the hole which the bullet had made in the fabric might have been difficult to discern. The fact, too, as appeared, that no other bullet-holes were found in the walls or woodwork of the room, together with the fact that it was proved beyond question that five shots were fired, furnished circumstances which would aid in identifying the bullet found underneath the floor as being one of those of which theretofore no trace had been discovered. There was testimony that the bullet corresponded in size and character to the other bullets found in and about Bell's body. It was, of course, a matter for the jury to consider and determine as to what the position of Bell's body was at the time that shot was fired. It was not error to admit the evidence in rebuttal. (Pen. Code, sec. 1105.)

It is complained that certain instructions given by the trial judge did not sufficiently state the law as the defendant was entitled to have it expressed, and that certain instructions offered by the defendant were improperly rejected by the court. The fault with the contentions made as to the alleged errors so complained of is that they do not take into view the entire charge as given by the court, but point to segregated portions thereof · which, standing alone and without the qualification furnished by other portions of the instructions, seem to make an insufficient statement of the law. It must be assumed always that the jury comprehended and considered the entire charge of the court. [4] We find upon examination that on the question of the right of self-defense the court's charge was clear and full·

in its statement of the rights which the defendant possessed, both to defend herself from an attack which threatened her life, or threatened great bodily injury to her, and to use the judgment of a reasonable person *situated in like circumstances,* and that, when so acting, if she believed herself to be in grave danger, as defined in the instructions, then she might there stand and kill her assailant and be justified, even though it afterward appeared that, as a matter of fact, the danger which for the moment was apprehended by her was not real; all in accordance with principles so well settled as to be fundamental in the law. Counsel's assertion that the court by its instructions imposed upon the defendant the duty to act as a reasonable person would have acted, without the qualification that the jury should consider the situation from the standpoint of the defendant situated as she was shown to have been at the time, is not borne out by the text of the instructions given. [5] The instruction that if the defendant fired a shot into the body of Bell after he was lying upon the floor and after all necessity for the use of a deadly weapon in self-defense had ceased, she would not be justified, correctly expressed the law when considered with the other qualifying terms contained in the body of the same instruction.

The instruction that evidence as to the character of the deceased being that of a violent, quarrelsome, and dangerous man was to be considered "only" as a circumstance illustrating "the facts of the homicide, and indicating the aggressor and the nature of the aggression, it being more probable that a man of violent and dangerous character would make an unprovoked and deadly assault than that a quiet and peaceable man would do so," was perhaps not particularly lucid in its terms, but neither was the one which counsel for defendant offered purporting to cover the same ground, with some addition thereto. By the additional matter it was evidently intended that the jury should be advised that a person would be justified in acting with less deliberation and use more vigorous means in defending against an assault committed by a person of known violent character than where such character was not known to be possessed by such person. The additional matter, if clearly expressed, would have correctly stated the

law. But again, when examining the alleged error for the failure to give the instruction last referred to, we are met with the answer that in other instructions, given at the request of the defendant, the jury was told that the evidence as to the character of the deceased should be considered as a circumstance in determining whether or not by his acts and conduct he gave the defendant reasonable ground to apprehend such danger as to justify her in shooting him, and that if "in view of *previous acts or conduct or state of mind of the assailant,* of which the person assaulted is aware, indicate an imminent danger, the assailed is justified in acting with reference thereto."

[6] Again, it is complained that the district attorney was guilty of prejudicial misconduct in arguing to the jury that bullets were known to take unusual courses when deflected in their flight. This argument included a statement of alleged facts claimed to have been shown in another case in the same court, the district attorney stating, however, that he was making the statement for the purpose of illustration. Following his objection to this argument, defendant's counsel offered an instruction particularly advising the jury that they must not consider as evidence "any statement of counsel during the trial of this case or the argument thereof as to the personal knowledge, belief or opinion of the attorney who makes such statement," which the court refused to give. The court did, however, give the plain and pointed instruction that the jurors in making up their minds as to the guilt or innocence of the defendant should be guided solely by the evidence introduced at the trial and by the instructions as to the law as given by the court. We are not prepared to agree that the district attorney transgressed the limits of a reasonable argument in illustrating his contentions in the way he did. It is no doubt better practice for counsel to refrain from presenting alleged facts of other cases for the purpose of convincing the jury of the logic of the argument. The instruction of the court, advising the jury as to what it might properly consider as a basis for its finding, we must assume was observed, and that remarks of the district attorney were considered for their argumentative weight only and as by way of illustration.

The record presented here in nowise presents a case wherein the right of a defendant to a fair and impartial trial has been infringed upon. The evidence discloses a situation where a jealous woman became infuriated at what she believed to be the unfaithfulness of her companion and, with malice and intent to do the very thing she accomplished, made an attack and shot to death the man whom she believed had come to prefer another woman to her, and this without believing in the smallest degree that it was necessary to resort to such extreme means to defend herself against a threatened attack.

The judgment and order are affirmed.

Conrey, P. J., and Houser, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 3, 1923.